UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


TIFFANY TOOTHMAN,
an individual,

        Plaintiff


v.                                    Civil Action No. 2:08-1037


BOB EVANS FARMS, INC. SHORT-TERM DISABILITY PLAN,
an Ohio Employee Welfare Benefit Plan, and
AMERICAN GENERAL LIFE COMPANIES, LLC,
a Texas Corporation, and
AIG LIFE INSURANCE COMPANY
a Texas Corporation, and
DOES 1 through 10, inclusive,

        Defendants


MEMORANDUM OPINION AND ORDER


        Pending are the motion for summary judgment of

defendants American General Life Companies, LLC, and AIG Life

Insurance Company ("AIG"), filed June 12, 2009, and plaintiff

Tiffany Toothman's motion for summary judgment, filed June 15,

2009.



I.



        Bob Evans Farm, Inc., holds a group disability

insurance policy issued by AIG. (Admin. Rec. at 2)("AR").  The

AIG policy includes a short-term disability plan ("plan").  The plan defines the term "Disabled/Disability" in pertinent part as follows:

> Disabled/Disability means our determination that a change in your functional capacity to work as a result of your Medical Condition began while you are covered under the Group Policy and:
>
> During the STD Benefit Qualifying Period and the STD Maximum Duration of Benefits:
>
> •    Prevents you from performing the Essential Functions of your Regular Occupation or a Reasonable Employment Option offered to you by the Employer; and
>
> •    As a result you are unable to earn more than 80% of your Predisability Weekly income.
>
> . . . .
>
> Essential Functions means functions which are normally required for the performance of an occupation and which cannot be reasonably omitted or modified. However, if you were normally required to perform Essential Functions in excess of 40 hours per week prior to becoming Disabled, we will consider you able to perform Essential Functions at that required Predisability level if you are working or have the capacity to perform such functions at least 40 hours weekly.
>
> Medical Condition means an accidental injury, sickness, mental illness, substance abuse or pregnancy.

(AR 10).

On January 16, 2006, Ms. Toothman was serving as an assistant manager at a Bob Evans Farms, Inc., restaurant.  (AR 124).  On that same date, she filed with AIG an initial

notification form seeking short-term disability benefits.  (AR
124).  She attached a Physician's Disability Certificate executed
by her treating physician, Marie L. Kessel, M.D., reflecting a
diagnosis of mononucleosis. (AR 125).  Ms. Toothman complained
of, <u>inter alia</u>, muscle aches, "fatigue, fever[, and] malase
[sic]."  (AR 125, 78).

On February 7, 2006, Ms. Toothman was again seen by Dr.
Kessel, who noted that she did "not seem to be any better."  (AR
76).  Ms. Toothman reported that she was sleeping all the time
and "afraid to be around people."  (AR 76).  It was additionally
noted that Ms. Toothman was still at times running a fever and
experiencing nausea.  (AR 76).  On February 23, 2006, Ms.
Toothman returned to Dr. Kessel, with symptoms that included
swollen lymph nodes and headaches.  (AR 75).  During a March 9,
2006, visit to Dr. Kessel, Ms. Toothman's lymph nodes were still
enlarged, she had a low-grade fever, she remained fatigued, and
she reported coughing, wheezing, and sleep difficulties.  (AR
74).

On March 10, 2006, an infectious disease specialist,
Fred Kerns, M.D., examined Ms. Toothman upon a referral from Dr.

Kessel for a mono-like illness.[1]  (AR 340).  He noted her "main

complaint" was fatigue, along with an asthma flare-up.  (AR 340).

He also noted her reports of sleep difficulties, occasional fever

and night sweats, loss of appetite, nausea, diarrhea, and feeling

"achy all over."  (AR 340).  Dr. Kerns had the following

impressions:

> 3 month history of fatigue -- not typical of mono given
> the age of the patient, history of mono in the past,
> the lack of diffuse adenopathy or any accompanying
> findings and the lack of improvement over several
> months.  It is possible that [Epstein Barr Virus
> ("EBV")] . . . plays a role here but it is also more
> likely that she has positive serologies of a
> nonspecific nature maybe worsened by her Prednisone
> use.  2. Asthma that is flared up and is suboptimally
> responsive probably triggered by a respiratory virus
> infection.  3. Fatigue most likely secondary to all of
> the above and lack of sleep.

(AR 340).

On March 15, 2006, AIG found Ms. Toothman to be

disabled temporarily from January 12, 2006, through March 27,

2006, and benefits were paid to her accordingly.  (AR 139).  In a

return-to-work certificate authored by Dr. Kessel on March 9,

2006, Ms. Toothman was released to return to work as of March 28,

2006. (AR 137).  On March 27, 2006, however, Dr. Kessel submitted

---

[1]Dr. Kerns' chart entry for the March 10, 2006, visit begins:

> Referring physician: Dr. Maria Kessel
> Re: Mono-like illness

(AR 340).

to AIG a patient information form respecting Ms. Toothman.  (AR 145-46).  Dr. Kessel noted that she had seen Ms. Toothman that same day and diagnosed her with mononucleosis.  (AR 145).  While she added that the expected return-to-work date was "unknown," she failed to list any functional limitations for Ms. Toothman.  (AR 146).  No mention is made by Dr. Kessel of the observations by Dr. Kerns that Ms. Toothman's history was "not typical of mono" and that, although Epstein Barr Virus possibly played a role, it was "more likely that she has positive serologies of a nonspecific nature maybe worsened by her Prednisone use."  (AR 340).

On March 23, 2006, Ms. Toothman visited Dr. Kerns again.  (AR 338).  She noted that her symptoms were essentially unchanged, with the exception of increased bowel issues.  (Id.)  A March 31, 2006, chart entry by Dr. Kerns, however, notes that Ms. Toothman "did not show for [a] CT AB & Pelvis, per CAMC scheduling.  She did not [r]eschedule appt. -- No show for office visit . . . ."  (Id.)  It does not appear that she saw Dr. Kerns again.

On May 4, 2006, Ms. Toothman was seen at the Roane General Medical Clinic.  Her return to work date was listed as "unknown."  (AR 152). On May 15, 2006, AIG informed Ms. Toothman concerning the termination of her benefits, stating as follows:

> The medical information received does not support
> disability as defined by the Group Policy.  The
> recently received medical documents of lab results of
> 3/10/06 are within normal limits.  You indicate fever
> and chills and the readings from the 3/27/06 and 5/4/06
> office visits show tempurature [sic] within the normal
> range.  At this time, the complaints of not being able
> to work are subjective and lack objective medical
> evidence.

(AR 162).  On May 17, 2006, AIG once again informed Ms. Toothman

that her benefits were being terminated as of May 10, 2006, and

also that her benefits claim had been approved for the dates of

January 12, 2006 through May 9, 2006. (AR 165).

On May 24, 2006, a CT scan of the abdomen revealed a

cyst in Ms. Toothman's left ovary. (AR 79).  Her liver, spleen,

kidneys, adrenal glands and pancreas were normal and no

lymphadenopathy was present.  (AR 79).  On July 20, 2006, she

reported new symptoms to Dr. Kessel, namely, heavy vaginal

bleeding, painful urination, depression, and joint pain. (AR 71).

On August 22, 2006, Ms. Toothman appealed the May 15,

2006, benefits denial. (AR 170-73).  Her handwritten letter

explains diagnoses of both mononucleosis and EBV, which she

claimed had afflicted her from January 13, 2006, through the date

of her appeal.  (AR 171-73).  She added as follows:

> The fatigue I experience is very overwhelming in which
> everyday tasks are difficult on my body. . . . To date
> I am still under continuous doctor care and am not in a
> releasable condition.

6

. . . .

My recovery is very much on the upside and
hopefully I will be able to return within the next
couple months.  I very so much need the compensation I
deserve.

(AR 171, 72).


On August 24, 2006, Dr. Kessel examined Ms. Toothman

again.  (AR 221).  She wrote "Flu Mono" on the physician record

and additionally noted fatigue, headaches, blood in her urine and

associated pain, swollen lymph nodes, chills, low-grade fever,

abdominal pain, nausea, and diarrhea. (AR 221).  Ms. Toothman

apparently reported to Dr. Kessel that she felt like she had the

flu.  (AR 221).


On October 6, 2006, in response to her appeal, AIG

upheld its initial determination. (AR 180-81).  The decision was

based upon Dr. Kessel's physician notes of May 4 and July 20,

2006, reflecting that Ms. Toothman had a normal temperature, a

non-tender abdomen, a lack of distress, recent lab results

indicating normal white blood cell counts, a recent CT Scan

report finding her liver, spleen, adrenals, and kidneys were all

functioning within normal limits and the lack of lymphadenopathy.

(AR 180-81).  AIG mentioned the August 24, 2006, physician report

as well, which reflected a body temperature of 99 degrees but

7

explained that Ms. Toothman had reported again to the treating physician, Dr. Kessel, that she "felt as though . . . [she] may have the flu."  (AR 181).

On November 5, 2006, Ms. Toothman injured her lower back while housecleaning.  (AR 369).  During a chiropractor visit the next day with Richard Jones, D.C., at World Wide Health Services ("WWHS"), Ms. Toothman was diagnosed with lumbar disk degeneration and segmental dysfunction at multiple levels. (AR 370).  She rated her pain at a 6/7 on a scale of 1 to 10.  (AR 372).  Ms. Toothman had additional visits to WWHS on November 8, 2006; November 9, 2006; November 13, 2006; December 28, 2006; January 2, 2007; January 5, 2007; January 9, 2007; and January 16, 2007. (AR 373-76).

On December 8, 2006, Ms. Toothman visited Dr. Kessel again, reporting fatigue and sore throat.  (AR 215).  It was noted on the physician's report that her "response to therapy" was unchanged, that her glands were still swollen, she was suffering from depression, she tested positive for EBV and an abscess had been found on her breast.  (AR 215).  Ms. Toothman reported to Dr. Kessel as follows: "My whole life has changed." (AR 215).  On December 22, 2006, another denial of benefits was issued by AIG finding that she did not satisfy the plan

8

definition of disability.  (AR 184).  On January 18, 2007, the abscess was surgically removed by Dr. Michael Roberts.  (AR 231).

On February 5, 2007, Ms. Toothman's lawyer requested a copy of the Plan and Ms. Toothman's file.  (AR 187).  On February 14, 2007, the materials were provided to him. (AR 192).  On March 19, 2007, Ms. Toothman's lawyer requested that AIG re-open the administrative record to permit Ms. Toothman to submit additional information in support of her claim.  (AR 194 ("Not allowing additional information to be reviewed will leave us no alternative but to file suit. . . . Ms. Toothman remains very sick and unable to return to any job.")).

On April 5, 2007, AIG granted counsel's request to reopen.  (AR 197).  It promised to defer further review until the earlier of 90 days from that date of reopening (a deadline of July 4, 2007), or the date all additional information was provided and certified as such by counsel.  (AR 197).

On April 12, 2007, Ms. Toothman began seeking treatment for mental health issues from Westbrook Health Services.  (AR 357-58).  It was noted that prior to this date she had "no history of psychiatric services."  (AR 357).  The social worker who assessed her that day, Margaret Wegman, diagnosed her with

severe depression.  (AR 358).  Ms. Wegman noted that Ms. Toothman

had "poor insight, poor judgment, poor concentration, [and] poor

recall . . . . for the last year."  (AR 357).  Also reported were

"low energy, depression and reported health problems."  (AR 358).

On June 21, 2007, a Functional Capacity Evaluation was

performed by the Holzer Clinic ("Holzer Clinic FCE"), apparently

at the request of Ms. Toothman's counsel.  The three-page Holzer

Clinic FCE reports that Ms. Toothman suffered from "Chronic

Fatigue Immune Deficiency Syndrome," and abdominal, lower back

and neck pain.  The Holzer Clinic concluded that Ms. Toothman did

not satisfy the Department of Labor's criteria for sedentary

work.

After receiving from AIG an extension of the deadline

to submit further medical information, on July 16, 2007, Ms.

Toothman's counsel instituted a further appeal with attached

exhibits. (AR 208-322).  The letter lodging the appeal provided

pertinently as follows:

> In short, Tiffany Toothman is 35.  Her job with
> Bob Evans Farms was as an assistant manager.  Her
> medical conditions include mononucleosis, Epstein-Barr
> virus, chronic fatigue syndrome "CFIDS", cysts forming
> on ovaries and breasts and a sleeping disorder.  These
> are the most severe of her impairments.
>
> . . . .
>
> In light of the medical evidence, vocational

evidence and the anticipated favorable decision from
the Social Security Administration, AIG's actions
regarding this claim should be considered arbitrary and
capricious. . . .

(AR at 209).

On September 11, 2007, AIG informed Ms. Toothman's
counsel that the claim was being referred for an independent
medical review. (AR 379).  On October 6, 2007, AIG received the
independent medical report of Thomas Winters, M.D.  (AR 381-85).
Dr. Winters noted that he had contacted both Drs. Kessel and
Kerns regarding Ms. Toothman.  (AR 381).  Dr. Winters first
summarized the medical records received by him, which spanned
from January 16, 2006, through April 12, 2007.  Those records
included other medical care beyond that set forth previously in
this memorandum opinion and order.[2]

Dr. Winters also summarized the disability evaluation
documents transmitted to him by AIG, including the following:

•       The June 21, 2007, Functional Capacity Evaluation by
        the Holzer Clinic.  Dr. Winters noted that the Holzer
        Clinic FCE reflected that she could lift up to 10

_____

        [2]The records reflect the following additional medical
treatment: (1) an August 2, 2006, pelvic ultrasound revealing
ovarian cysts; (2) a September 29, 2006, visit to Dr. Kessel for
fatigue and "something on her neck," at which time it was noted
that Ms. Toothman's vital signs were normal and no adenopathy was
found, and (3) a November 9, 2006, visit to Dr. Kessel, during
which time Ms. Toothman was taking Effexor.

pounds, push and pull less than 40 pounds, and walk,
stand, and bend between two and three hours.

- A June 25, 2007, evaluation by an entity known as the
Occupational Disability Assessment Center opining that,
based upon the Holzer Clinic FCE outcome, Ms. Toothman
could not work.
Dr. Winters also reflected the substance of his

communications with Drs. Kessel and Kerns.  On October 2,

2007, Dr. Winters spoke with Dr. Kessel, who reported as follows:

1.    That Ms. Toothman was diagnosed with Chronic Fatigue
      Syndrome but it was "unclear what prevents her from
      working." (AR 384);

2.    That Ms. Toothman was unable to return to work on May
      10, 2006, inasmuch as she offered subjective complaints
      and self-reported symptoms, including fatigue;

3.    That there were "[n]o physical symptoms . . .
      preventing her from performing" her job. (AR 384); and

4.    That Ms. Toothman had multiple somatic symptoms that
      are preventing her from returning to work.

        On October 5, 2007, after several attempts to speak

with Dr. Kerns by phone, Dr. Winters learned from Dr. Kerns via

email that "he had last seen the patient one and a half years ago

and he was unable to comment beyond the chart notes from then . .

. ." (AR 384).  Based upon his review of the medical records and

these discussions with Ms. Toothman's treating physicians, Dr.

Winters concluded as follows:

    [T]here are multiple medically unexplained symptoms and
    subjective complaints that are reported by Ms.
    Toothman.  None of these subjective complaints are

12

supported by any testing.  She did not meet the
criteria for chronic fatigue syndrome provided by the
Center for Disease Control or any other infectious
disease society.  It does not appear that the
restrictions and limitations that have been provided
nor the [Holzer Clinic] FCE that imposes severe
limitations on work capability nor the Vocational
Evaluation which depended solely on the [Holzer Clinic]
FCE are consistent with any objective findings.  It
does not appear that she has a significant impairment
based on the medical evidence from 5/10/06 to present.

Based on the evidence, workers with self-reported
fatigue syndromes have work capability and introduction
into the work environment four hours a day for two to
three weeks would be reasonable and then escalate her
to her normal shift after that time.  Restrictions and
limitations would include no lifting over 30 pounds, no
pushing or pulling over 40 pounds, and she should be
successful in carrying out at work as an assistant
manager of a food market.

The summary of the communication with Dr. Kessel and
the e-mail communication with Dr. Kerns supports my
summary as there are no objective findings that would
support impairment and severe restrictions and
limitations as have been posed in the past, as all
symptoms are self-reported and subjective with no
objective collaboration.  The use of [EBV] . . .
serologic tests to make a diagnosis of chronic fatigue
syndrome is not an acceptable medical standard nor
practice and are irrelevant to the diagnosis being
rendered which has led to severe restrictions and
limitations.

(AR 385).

        Apparently at AIG's request, on October 16, 2007, Mark

McKenna, Vocational Rehabilitation Specialist, issued a report.

(AR 387).  Mr. McKenna was quite critical of the Holzer Clinic

FCE of June 21, 2007, that had been presented by Ms. Toothman's

13

counsel, noting multiple reasons why it may not have accurately assessed whether Ms. Toothman exerted sufficient effort during the testing period. (AR 387).  Inasmuch as the Holzer Clinic FCE was deemed flawed, the report from the Occupational Disability Assessment Center, based apparently upon the Holzer Clinic FCE submitted by Ms. Toothman's counsel, was also treated as unreliable. (AR 389).

On October 24, 2007, AIG notified Ms. Toothman's counsel in a lengthy and detailed letter that she was no longer disabled, and thus disentitled to disability benefits, as of May 10, 2006.  (AR 391).  It is noted in the letter that AIG, after receiving the additional records from Ms. Toothman's counsel with her appeal, nevertheless sought further records from Dr. Kerns, Dr. Jones, and Westbrook Health Services.  (AR 392).  After discussing the medical record, AIG quoted the applicable plan language and concluded, in part, as follows:

> From a medical standpoint, we find that Ms. Toothman has not satisfied the medical element of disability from May 10, 2006 . . . . While we note that your client experiences symptoms of fatigue, weakness, irritability and forgetfulness, there is no medical evidence on file to support restrictions and limitations which would preclude work activity in her Regular Occupation.

(AR 395).

14

II.

The court notes initially that it is the claimant's
burden to demonstrate her entitlement to benefits under the plan.
Ruttenberg v. U.S. Life Ins. Co., 413 F.3d 652, 663 (7th Cir.
2005); see Stanford v. Continental Cas. Co., 514 F.3d 354, 364
(4th Cir. 2008) (Wilkinson, J., dissenting) (quoting Gallagher v.
Reliance Standard Life Ins. Co., 305 F.3d 264, 270 (4th Cir.
2002), as providing that "claimants bear the burden of proving
disability.").

The standard of review for a decision made by an
administrator of an ERISA benefit plan generally is de novo.
Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989);
Bynum v. Cigna Healthcare of North Carolina, Inc., 287 F.3d 305,
311 (4th Cir. 2002); Richards v. UMWA Health & Retirement Fund,
895 F.2d 133, 135 (4th Cir. 1989); de Nobel v. Vitro Corp., 885
F.2d 1180, 1186 (4th Cir. 1989).  Where the plan gives the
administrator discretion to determine benefit eligibility or to
construe plan terms, however, the standard of review is whether
the administrator abused its discretion.  Firestone, 489 U.S. at
111; Stup v. Unum Life Ins. Co. of Am., 390 F.3d 301, 307
(4th Cir. 2004); Bynum, 287 F.3d at 311.

15

Under this standard, a plan administrator's decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. See Smith v. Continental Cas. Co., 369 F.3d 412, 417 (4th Cir. 2004); Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522 (4th Cir. 2000). "[A] decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 232 (4th Cir. 1997) (internal quotation marks omitted).

A recent alteration of the law in this area is noteworthy.  In Metropolitan Life Insurance Co. v. Glenn, 128 S.Ct. 2343 (2008), the Supreme Court discussed how a court conducts the review of a benefits determination when the plan administrator operated under a conflict of interest.  Our court of appeals previously accounted for a conflict of interest by way of the modified abuse of discretion standard.  See, e.g., Carden v. Aetna Life Ins. Co., 559 F.3d 256, 259-61 (2009); Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 358 (4th Cir. 2008). Following Glenn, however, "a conflict of interest becomes just one of the 'several different, often case-specific, factors' to be weighed together in determining whether the administrator

abused its discretion." Carden, 559 F.3d at 261 (quoting Glenn, 128 S. Ct. at 2351). The weight accorded to the conflict "will . . . depend largely on the plan's language and on consideration of other relevant factors." Id. at 261.

A nonexclusive recitation of those "other relevent factors" is found in Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan, 201 F.3d 335 (4th Cir.2000), which directs a reviewing court to consider:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Booth, 201 F.3d at 342-43; Johannssen v. District No. 1-Pacific Coast Dist., MEBA Pension Plan, 292 F.3d 159, 176 (4th Cir. 2002); see also Lockhart v. UMWA 1974 Pension Trust, 5 F.3d 74, 77 (4th Cir. 1993).

There are compelling reasons for the deferential standard of review, not the least of which is that it "'ensure[s] that administrative responsibility rests with those whose experience is daily and continual, not with judges whose exposure

is episodic and occasional.'"  <u>Brogan v. Holland</u>, 105 F.3d 158, 161, 164 (4th Cir. 1997) (noting no abuse is present if the decision "'is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'") (citations omitted); <u>Johannssen</u>, 292 F.3d at 169; <u>Lockhart</u>, 5 F.3d at 77 (noting the "dispositive principle remains . . . that where plan fiduciaries have offered a reasonable interpretation of disputed provisions, courts may not replace it with an interpretation of their own."

        Nevertheless, there are circumstances where a reviewing court will direct an administrator to have another look at a claim through the device of remand.  The circumstances justifying a remand, however, are quite exceptional:

> If the court believes the administrator lacked adequate
> evidence on which to base a decision, "the proper
> course [is] to 'remand to the trustees for a new
> determination,' not to bring additional evidence before
> the district court." As we have previously indicated,
> however, "remand should be used sparingly."  Remand is
> most appropriate "where the plan itself commits the
> trustees to consider relevant information which they
> failed to consider or where [the] decision involves
> 'records that were readily available and records that
> trustees had agreed that they would verify.'" The
> district court may also exercise its discretion to
> remand a claim "where there are multiple issues and
> little evidentiary record to review."

<u>Elliott v. Sara Lee Corp.</u>, 190 F.3d 601, 609 (emphasis supplied) (citations and quoted authority omitted); <u>Sheppard</u>, 32 F.3d at

125; <u>Weaver v. Phoenix Home Life Mut. Ins. Co.</u>, 990 F.2d at 159

(4th Cir.1993); <u>Berry v. Ciba-Geigy Corp.</u>, 761 F.2d 1003, 1008

(4th Cir. 1985) ("Case for remand of benefit termination decision

to pension plan trustees is strongest where plan itself commits

trustees to consider relevant information which they failed to

consider or where decision involved records that were readily

available and records that trustees had agreed that they would

verify.").


                              III.


        Three significant considerations are worth noting at

the outset.  First, the plan imposed upon Ms. Toothman the burden

of establishing her entitlement to benefits. (AR 06 ("We will pay

. . . benefits . . . upon receipt of satisfactory written proof

that you have become Disabled while your Coverage . . . is in

effect."); AR 14 ("You . . . must, at your own expense, provide

us or our authorized representative with proof that you are

Disabled as soon as possible . . . .")).

        Second, it appears undisputed that AIG is vested with

discretionary authority under the plan to determine if a claimant

has adequately proven a disability.  (<u>See</u>, <u>e.g.</u>, Pl.'s Memo. in

Supp. at 8 (conceding that the plan "clearly provides AIG . . .

                               19

with discretion to construe the terms of the [p]lan and to
determine whether or not a . . . participant is disabled under .
. . [p]lan.")).

       Third, it is apparent that AIG qualifies as a
conflicted administrator inasmuch as it serves as both (1) the
plan insurer responsible for the payment of benefits, and (2) the
arbiter concerning whether a participant meets the plan's
criteria for establishing a compensable disability.

       Regarding <u>Booth</u>, the parties' dispute appears to center
around the third, fifth, sixth, and eighth factors.  Respecting
the third factor, the adequacy of the materials considered to
make the decision and the degree to which they support it, the
record reflects that AIG made every effort to assure a complete
evidentiary package.  It never turned away relevant evidence,
accommodated Ms. Toothman's counsel's late efforts to submit more
records, and requested further documentation on its own from
multiple treating and independent sources following counsel's
submissions.  The result is a thoroughly developed record.[3]

_____

       [3]Ms. Toothman contends, however, that irregularities in the
record warrant remand.  She identifies only one piece of missing
evidence, which involves a visit to a Dr. Smith and a discharge
from physical therapy.  These records were specifically noted by
AIG, however, in its December 22, 2006, decision unfavorable to
                                                  (continued...)

Regarding support for the result reached, on August 22, 2006, Ms. Toothman expressed to AIG in writing that, despite the symptoms she was experiencing, her "recovery [wa]s very much on the upside and hopefully . . . [she would] . . . be able to return within the next couple of months."  (AR 172).  After this date, however, Ms. Toothman continued to self-report on, and expand, her symptomology.  As noted by AIG, these symptoms were essentially unaccompanied by any objective testing.  This is an important observation in view of Ms. Wegman's psychological assessment on April 12, 2007.  Ms. Wegman raised questions concerning Ms. Toothman's perceptive abilities, noting that she was experiencing "poor insight, poor judgment, poor concentration, [and] poor recall . . . . for the last year."  (AR 357).

---

[3](...continued)
Ms. Toothman.  The omission is harmless.

    Ms. Toothman additionally asserts that AIG did not have records of a July 8, 2007, record of hospitalization for deep venous thrombosis in her leg.  She was treated with anticoagulants and discharged a week later.  As noted, on July 16, 2007, counsel submitted a significant number of additional medical records to AIG and suggested they were complete.  (AR 211 (counsel stating in his July 16, 2007, cover letter that "we have enclosed several objective medical reports, including . . . ALL current medical records.").  Accordingly, to the extent the hospitalization is material, AIG is not responsible for failing to develop the record on the point.

From a more objective standpoint, AIG submitted the
medical records to Dr. Winters for an independent analysis.  Dr.
Winters appears to have engaged in a determined effort to
properly assess Ms. Toothman.  One indication of his diligence is
the multiple attempts he made to contact Dr. Kerns and his
assistant in October 2007, ultimately sending an electronic mail
message to assure he obtained Dr. Kerns' views.  In response, Dr.
Kerns professed that he was unable to comment beyond his chart
notes given the passage of time.  Additionally, Dr. Kessel, who
had seen Ms. Toothman many times over many months and is fairly
characterized as her principal treating physician, specifically
noted that subjective complaints, not "physical symptoms," were
all that prevented her from performing her job.

The illness from which Ms. Toothman suffered in January
16, 2006, and beyond involved flu-like, mononucleosis symptoms.
These symptoms multiplied over time.  It appears, however, that
her own physicians struggled with treatment options and
diagnoses.  Coupled with this, on March 27, 2006, Dr. Kessell
listed an "unknown" return-to-work date for Ms. Toothman, despite
the fact that no functional limitations accompanied her opinion.

The lack of any strong endorsement from these treating
physicians of Ms. Toothman's inability to work is compounded by
other factors.  For example, Dr. Winters noted that the Holzer

Clinic FCE submitted by Ms. Toothman's counsel reflected that she could lift up to 10 pounds, push and pull less than 40 pounds, and walk, stand, and bend between two and three hours.  Dr. Winters noted additionally that Ms. Toothman did not satisfy the applicable criteria for Chronic Fatigue Syndrome.  There is thus significant support for AIG's determination that Ms. Toothman did not satisfy the plan's disability definition.

Regarding the fifth factor, namely, whether the decision making process was reasoned and principled, it is again noteworthy that AIG made every effort to assure a fully developed record, a significant component to the full and fair review required by ERISA.  Other indications of a full and fair review are present as well.  For example, it was apparently AIG that directed Dr. Winters to contact Ms. Toothman's treating physicians. (AR 394).  Additionally, despite the fact that objective indicators were absent, AIG extended Ms. Toothman's initial award of benefits by 43 days.  These same considerations suggest that AIG's decision is in accord with the sixth Booth factor, namely, that it was consistent with the procedural and substantive requirements of ERISA.

Finally, as noted, a conflict of interest is present.  At the same time, the conflict appears to have played no role in

23

AIG's decision.  One has difficulty identifying any point in the administrative process where AIG acted unfairly or strained to reach an unwarranted result.

Ms. Toothman nevertheless asserts several reasons why she believes AIG abused its discretion.  First, she noted that on June 28, 2008, the Social Security Administration ("SSA") deemed her to be disabled with an onset date of January 13, 2006 ("SSA award").  She asserts that our court of appeals accords great weight to this onset date determination, along with the fact that the plan's disability definition is sufficiently similar to the SSA definition that resulted in the government benefit award.  Ms. Toothman relies principally on Richards v. UMWA Health & Ret. Fund, 895 F.2d 133, 138 (4th Cir. 1990), to support the thrust of her argument, namely, that AIG should be forced to follow the analysis, whatever it may have been, that caused the SSA to award benefits.

A detailed examination of this contention is unnecessary for several reasons.  Foremost, the SSA award is not found within the administrative record.  Its issuance postdated AIG's final decision by six-and-one-half months.  To now accord it any weight, much less a dispositive impact, runs contrary to settled precedent.  See Elliott, 190 F.3d at 608-09 (noting that

24

abuse-of-discretion review involves "'an assessment of the
reasonableness of the administrator's decision must be based on
the facts known to . . . [the administrator] at the time.'")
(quoting Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins.
Co., 32 F.3d 120, 125 (4th Cir. 1994)); see also Bernstein v.
CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995).

        Moreover, the only document found in the briefing
related to the Social Security decision is a two-page calculation
of benefits attached as Exhibit A to Ms. Toothman's memorandum of
law in support of summary judgment, which she refers to in that
brief as "the Fully Favorable Decision from the Social Security
Administration [(FFD)] . . . ."  (Pl.'s Memo. in Supp. at 2).
The actual FFD is found under Exhibit C to the complaint which
refers to it only once, stating that AIG's decision is "contrary
to . . . [t]he holding of the United States Social Security
Administration."  (Compl. ¶ 16.b).  The briefing, in its
entirety, contains no discussion of the analysis conducted by the
ALJ in the FFD, with the exception of (1) a phrase in the
aforementioned memorandum of law noting that Ms. Toothman's deep
venous thrombosis "was sufficiently important for the Social
Security Administration to mention in its decision . . . ," and
(2) a statement in her response brief that the FFD supported her

position that "she is disabled from any occupation . . . ."  (<u>Id.</u> at 15).  The failure to discuss the FFD may be related to its apparent shortcomings.[4]

Next, Ms. Toothman faults AIG for relying upon the opinions of Dr. Winters inasmuch as he never examined her.  It is now common for administrators to rely upon the reasoned opinions of non-examining, independent medical professionals in the benefits determination process.  The court cannot conclude that AIG's choice to rely upon Dr. Winters' opinions was an unreasonable one.

_____

[4]The analysis found in the FFD appears amiss in several respects.  For example, the FFD finds the results of the Holzer Clinic FCE to be valid but later states that Ms. Toothman has the capacity to perform sedentary work for less than an eight-hour workday.  As noted, the Holzer Clinic FCE concluded that Ms. Toothman did not satisfy the criteria for sedentary work.  The validity of the Holzer Clinic FCE is quite questionable in view of the critique of its contents offered by Mr. McKenna, discussed more fully within.

Also, the FFD lists pain as a limitation on Ms. Toothman's ability to work, but pain is nowhere listed in the ALJ's discussion of her medical records, a discussion which spans four brief paragraphs on half of one page of the five-page FFD.  Further, the FFD rejects, in a single conclusory sentence, certain unstated "State agency medical opinions," which are presumably contrary to a disability finding.  (FFD at 4).

Based upon the foregoing, the analysis found in the FFD, which came six-and-one-half months following AIG's final decision, does not warrant a remand to AIG for further reconsideration of its decision to deny benefits.  <u>See Champion v. Black & Decker (U.S.) Inc.</u>, 550 F.3d 353, 362 (4th Cir. 2008) ("We agree that 'remand should be used sparingly.'") (quoting <u>Elliott v. Sara Lee Corp.</u>, 190 F.3d 601, 609 (4th Cir. 1999) (internal quotation marks and citation omitted)).

Finally, Ms. Toothman challenges Mr. McKenna's vocational consultation performed at AIG's request.  As noted, the Holzer Clinic concluded that Ms. Toothman did not satisfy the Department of Labor criteria for sedentary work.  (AR 310).  Mr. McKenna expressed concerns surrounding the Holzer Clinic FCE, noting that "there is insufficient proof to support the [Holzer Clinic] conclusion that Ms. Toothman's level of function is less than sedentary [and] therefore unable to function at the Sedentary work level."  (AR 389).  Ms. Toothman notes that the question for review under the plan is not whether she is capable of performing sedentary work.  Rather, the issue is her ability to perform the essential functions of her regular occupation or another reasonable employment option offered by her employer. The parties appear to agree that Ms. Toothman's job falls within the category of "light duty[,]" a marginally more rigorous work classification than the sedentary level.  Ms. Toothman thus faults Mr. McKenna for opining in terms of sedentary work.

At the outset, it must be noted that it was the Holzer Clinic FCE, not Mr. McKenna, that first broached the issue of Ms. Toothman's ability to perform sedentary work.  Mr. McKenna was simply evaluating the Holzer Clinic's conclusions in that regard. Further, it is neither Mr. McKenna's, nor AIG's, obligation to prove Ms. Toothman entitlement to disability benefits under the

27

plan.  Instead, Mr. McKenna's report focuses upon the suitability of the Holzer Clinic FCE for purposes of basing a disability determination thereon.  In that regard, he found the Holzer Clinic FCE flawed in a number of respects.

For example, Mr. McKenna observes that the Holzer Clinic FCE fails to document a number of factors and criteria, leaving one to guess concerning whether Ms. Toothman exaggerated her symptoms or exerted sub-maximal effort during the Holzer Clinic FCE testing process.  In a setting such as this, where an objective diagnosis and resultant physical limitations elude several medical professionals, concerns surrounding the validity of testing measures are of the utmost importance.  Mr. McKenna observed additionally that it was

> unclear as to the credentials of the individual who performed the [Holzer Clinic] FCE testing.  [The examiner] . . . indicates that she is an Exercise Physiologist.  It is unclear if she has been certified to perform the . . . testing as well as being a certified and or licensed physical therapist.

(AR 389).

Mr. McKenna's detailed, substantial, and serious criticisms of both the Holzer Clinic FCE and the vocational analysis proffered by Ms. Toothman were thus properly considered by AIG in attempting to ascertain the validity of the two evaluations presented to it.  It was not unreasonable for AIG to

rely upon Mr. McKenna's misgivings concerning the evaluations and, in the balance, conclude that Ms. Toothman had not satisfied her burden to demonstrate functional deficits precluding her from performing her own job or any other reasonable employment option offered by her employer.

The decision by AIG to deny Ms. Toothman's request for disability benefits was both reasoned and principled.  Ms. Toothman has failed to demonstrate an abuse of discretion.

IV.

Based upon the foregoing discussion, it is ORDERED as follows:

1.   That defendants' motion for summary judgment be, and it hereby is, granted;

2.   That plaintiff's motion for summary judgment be, and it hereby is, denied; and

3.   That this action be, and it hereby is, dismissed with prejudice and stricken from the docket.

The Clerk is requested to transmit this written opinion and order to all counsel of record and to any unrepresented parties.

ENTER:  December 14, 2009

John T. Copenhaver, Jr.
United States District Judge